IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

| | |
|---|---|
| F.W. BURDINE, ET AL., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 4:07CV064 |
| v. ) | |
| ) | Judge Marvin E. Aspen |
| TELEFLEX INCORPORATED and ) | |
| JOHN SICKLER, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM ORDER AND OPINION

MARVIN E. ASPEN, District Judge:

This matter comes before the court upon Plaintiffs' motions for partial summary judgment on liability and compensation and for summary judgment on Defendants' counterclaim. For the reasons discussed below, we deny both motions.

## BACKGROUND

Plaintiffs in this case are some of the Minority Shareholders in American General Aircraft Holding Co., Inc. ("AGAH"), a Delaware corporation. (Mem. on Liability at 1; Def. Resp. on Liability at 1.) Teleflex, Inc., a Delaware corporation headquartered in Limerick, Pennsylvania and one of the Defendants in this case, is the majority shareholder of AGAH. (Mem. on Liability at 1.) John Sickler, the other Defendant, is the president of AGAH and a former vice-chairman of Teleflex. (*Id.*; Resp. on Liability at 1.) AGAH was organized in 1993 for the purpose of acquiring assets from American General Aircraft Corp. ("AGAC"). AGAH's organizers initially planned to purchase AGAC's assets, hold them while AGAC went through Chapter 11 bankruptcy, and eventually sell them back to AGAC after it reestablished itself. (*See*

Mem. on Liability at 2 n.2; Resp. on Liability at 2.) AGAH purchased two sets of assets from AGAC (collectively, "Assets"): (1) the Cougar Assets, which included certain tooling and type certificates for the Cougar Aircraft; and (2) the Tiger Assets, which included type certificates for the Tiger Aircraft. (Resp. on Liability at 3; Mem. on Liability, Ex. A, Agreement ¶ C.) However, AGAC never emerged from Chapter 11 and eventually filed for Chapter 7 bankruptcy. (Mem. on Liability at 2 n.2; Resp. on Liability at 2.)

After AGAC filed for Chapter 7 bankruptcy, the AGAH shareholders entered into a Shareholders Agreement ("Agreement") on August 1, 1994 to expand the purpose of AGAH. (Mem. on Liability, Ex. A, Agreement ¶ D; Resp. on Liability at 2) Per the Agreement, AGAH "was organized for the purpose of acquiring the Assets from AGAC, to hold and, ultimately, dispose of or otherwise put such Assets to productive use for the benefit of AGAH and the Shareholders." (Agreement ¶ D.) The Agreement also obligated AGAH to distribute profits to the Shareholders:

> Upon [AGAH's] disposition (whether by sale, lease, joint venture or otherwise) of all or part of the Assets, it will (I) first pay or otherwise satisfy all of its liability and, thereafter, (ii) distribute the net profits arising from such disposition, after payment of all income taxes and expenses related thereto ("Net Profits"), in respect of the Teleflex Shares and the Minority Shares in accordance with the terms and conditions of this Agreement. It is intended that Net Profits arising from any sale, lease or other use of the Assets be distributed in accordance with the terms of this Agreement.

(*Id.* ¶ E.) The Agreement also set forth various tranches, according to which Net Profits were to be distributed among the majority and Minority Shareholders. (*Id.* at Art. 1.4.) The Agreement identified Teleflex as the majority shareholder, owning 20,000 shares of AGAH's issued and outstanding common stock, making up approximately 74% of the stock. (*Id.* ¶ A.) The Minority Shareholders collectively owned 7,000 shares, making up approximately 26% of the stock. (*Id.*)

The AGAH board members were: Bob Crowley, Chairman and Secretary (Crowley was also AGAC's former CEO); John Sickler, President and Treasurer (Sickler was also the Vice-Chairman of Teleflex); Brad Beckman, Assistant Secretary (Beckman also served as counsel for AGAH and Teleflex); and Charles A. Perry. (Resp. on Liability at 3.)

In 1996, AGAH successfully sold the Cougar Assets for approximately $3 million. (Resp. on Liability at 3, Ex. B.) However, they had difficulty finding a purchaser for the Tiger Assets. AGAH and the AGAC Estate, which still owned some of the Tiger Aircraft tooling that AGAC did not sell to AGAH, entered into a joint marketing agreement obligating AGAH for marketing these assets. (Resp. on Liabilities at 4, Ex. C.) The AGAC Estate would pay AGAH for its marketing costs after the assets were sold and the two entities would split the profits from the sale. (*Id.*) Pursuant to that agreement, AGAH spent three years trying to find a purchaser for the Tiger Assets, and with the help of Teleflex, eventually found a purchaser for the Assets: Tong Lung Metal, a company based in Taiwan. (*Id.* at 4-5.) Tong Lung Metal agreed to purchase the Tiger Assets for $7.3 million on the condition that there would be a joint venture created through which Teleflex, Crowley, and some others would assist in the new manufacturing pursuits. (*Id.* at 5, Ex. E ¶ 5; Sickler Dep., Vol. I at 51.)

Accordingly, TLM Aerospace, a wholly-owned subsidiary of Tong Lung Metal, and TFX Management Group, Inc. ("TFX Management") entered into a joint venture creating TLM Aircraft. (*Id.* at 5-6, Ex. F, TLM Aircraft Joint Venture Agreement.) At this stage, there is an open question of fact as to the corporate structure and ownership of TFX Management. (*See, e.g.*, *id.* at 6; Dkt. No. 75, Pl.'s Reply in Support of Mot. for Leave to File Second Am. Compl. ¶ 3.) The Joint Venture Agreement entered into by TFX Management and TLM Aerospace lists

TFX Management as a wholly-owned subsidiary of Teleflex. (Resp. on Liability, Ex. F at 1.) However, certain other documents, including AGAH tax returns, indicate that TFX Management is a wholly-owned subsidiary of AGAH. (*See, e.g.*, *id.*, Ex. I.) Sickler testified that AGAH owns TFX Management (Sickler Dep., Vol. I at 27); however, Crowley was unsure of its corporate structure. (Crowley Dep. at 27.) Beckman testified that he was unsure of TFX Management's structure (Beckman Dep. at 87-99), but also sent an email to Sickler in February 2006 stating that it was owned by AGAH (Resp. on Liability, Ex. I.) Regardless of its ownership, TFX Management was clearly the entity that entered into the joint venture agreement with TLM Aerospace, creating TLM Aircraft. (Resp. on Liability, Ex. F at 1.) The Board of Directors for TLM Aircraft was made up of three representatives of Tong Lung Metal and Crowley, Sickler, Beckman, and Peter Lo, a former Teleflex employee. (Resp. on Liability, Ex. F at 7.) TFX Management initially subscribed for 200 shares of common stock (20%) at a cumulative price of $675,000, which would pay the salaries of Crowley and John Witcher, who were overseeing the manufacturing of the airplanes for TLM Aircraft, for two years. (*Id.* at 8.)

Soon after TLM Aircraft was formed, TLM Aerospace/Tong Lung Metal began defaulting on their obligations to the joint venture. TFX Management began making large advances to TLM Aircraft so it could begin construction on its new facility and prepare for manufacturing the aircraft. (*Id.* at 7.) However, TFX Management made these advances using money from AGAH bank accounts. (*Id.*) Teleflex also contributed to TLM Aircraft, but it did so in the form of loans that were repaid, rather than capital contributions. (*Id.*) TLM Aerospace/Tong Lung Metal defaulted on its final payment of $2.3 million to the AGAC Estate for its purchase of the Tiger Assets. (*Id.*) This default left TFX Management as TLM Aircraft's

sole shareholder and allowed TLM Aircraft to retain possession of the Tiger Assets. (Resp. on Liability, Ex. K ¶¶ 9-11.) TLM Aircraft paid $2.392 million, the amount TLM Aerospace owed plus interest, to the AGAC Estate to satisfy TLM Aerospace's debts. (*Id.*) This payment came from an AGAH bank account. (Resp. on Liability at 8; Sickler Dep., Vol. I at 96; Beckman Dep. at 151-52.) TLM Aircraft then changed its name to Tiger Aircraft LLC and entered into a new investment agreement in which three Taiwanese entities purchased shares of Tiger Aircraft from TFX Management. (Resp. on Liability, Ex. L.) TFX Management served as Tiger Aircraft's managing member and Crowley was its CEO. The Defendants provided evidence showing that TFX Management used the money it made from the sale of shares to the three Taiwanese entities to repay AGAH the $2.392 million it gave TFX Management for the purchase of the Tiger Assets from the AGAC Estate. (Resp. on Liability, Ex. M.)

Despite these attempts to make Tiger Aircraft a successful company, it was never profitable and continued to need capital contributions. Accordingly, TFX Management made several contributions and loans to Tiger Aircraft, all of which came from AGAH bank accounts. In 2006, Tiger Aircraft filed for bankruptcy. (Resp. on Liability at 9.)

AGAH received approximately $6.9 million from the sale of the Assets it purchased from AGAC. (Mem. on Liability at 3; Resp. on Liability at 9; Sickler Dep., Vol. I at 106; Crowley Dep. at 39.) However, it only distributed approximately $3.417 million to its shareholders pursuant to the tranche mechanism in the Agreement. (Resp. on Liability at 9.) Under the first tranche, AGAH distributed $1 million to Teleflex and $700,000 to the Minority Shareholders in March 2000. (*Id.* at 9 n.16; Mem. on Liability at 3.) It distributed $1 million to Teleflex and

nothing to the Minority Shareholders under the second tranche.[1]  Finally, under the third tranche, AGAH distributed $522,500 to Teleflex and $195,000 to the Minority Shareholders in February 2001.  This final payment was half of what was due to both Teleflex and the Minority Shareholders pursuant to the Agreement.  (Resp. on Liability at 9 n.16.)  The remaining money that AGAH did not distribute to its shareholders was used the to fund the TLM/Tiger Aircraft joint venture.  (*Id.* at 9-10.)

Plaintiffs filed this suit to recover money they allege is owed to them under the Agreement and state law.  They now move for partial summary judgment regarding liability and compensatory damages and for summary judgment on Defendants' counterclaim.

**STANDARD OF REVIEW**

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56©.  A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).  Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's

---

[1] Pursuant to the Agreement, the Minority Shareholders would not receive a distribution under the second tranche.  (Mem. on Liability, Ex. A at Art. 1.4(b).)

-6-

pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e).

We may not decide any open factual issues in the record on a motion for summary judgment. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513. In ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* Moreover, we must accept as true all evidence presented by the non-movant, and draw all justifiable inferences in its favor. *Id.*; *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002).

## ANALYSIS

### I. Liability and Compensatory Damages

Plaintiffs moved for summary judgment on their breach of contract claim (Mem. on Liability at 10); their claim for liability under title eight, section 271 of the Delaware Code[2] (*id.* at 9); and for compensatory damages in the amount of $1,536,400 (*id.* at 11). Each claim is addressed separately.

### A. Breach of Contract

The construction of a contract is purely a question of law. *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Clear and unambiguous language in a contract should be given its ordinary and usual meaning. *Id.*; *Lorillard Tobacco Co. v. American Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "'When the language of a . . .

---

[2] The Agreement states that "[t]his Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by and construed in accordance with the laws of the State of Delaware." (Agreement Art. 8.4.) Accordingly, we apply Delaware law to the issues presented here.

contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity were none exists could, in effect, create a new contract with rights, liabilities, and duties to which the party had not assented.'" *Lorillard Tobacco Co.*, 903 A.2d at 739 (quoting *Rhone-Poulenc Basic Chems.*, 616 A.2d at 1195-96). We may only look to extrinsic evidence to aid in the interpretation of a contract where there is ambiguity. *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991). "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems.*, 616 A.2d at 1196.

Plaintiffs allege that Defendants breached the Shareholder Agreement by not making distributions to shareholders, but instead using AGAH's money for TFX Management to invest in the TLM/Tiger Aircraft venture. (Mot. on Liability at 10.) Plaintiffs claim that neither Teleflex nor Sickler had the authority to invest AGAH's assets in this manner. (*Id.*) They further contend that the "unequivocal language of the Shareholders Agreement" created an expectation that they would receive distributions of "any money that AGAH received from the disposition of the Assets." (Mot. on Liability at 10.) To support their argument, Plaintiffs predominately rely on the testimony of Beckman, former counsel for Teleflex and AGAH, to support their contention that the Defendants should have distributed the "money"[3] it had to the shareholders, rather than invest it in the joint venture via TFX Management. (*See, e.g.*, Mem. on

---

[3] Plaintiffs may be confusing the meaning of Net Profits when they consistently argue that they were entitled to "any money that AGAH received from the disposition of the Assets" or to "any cash in the hands of AGAH." (Mem. on Liability at 10; Reply on Liability at 5.) The ultimate issue is whether AGAH failed to distribute *Net Profits* to the shareholders, not whether it failed to distribute any *cash* it had. (Agreement ¶ E.) At this point, and for reasons discussed further below, we are not in a position to determine whether there were any Net Profits that Defendants failed to distribute.

Liability at 11; Reply on Liability at 3-5.) Beckman's testimony may be useful to the extent the Agreement is ambiguous and we need to consult extrinsic evidence to aid our interpretation of the contract. However, because neither party argues that the Agreement is ambiguous, we assume, for the purposes of this motion *only*, that it is not ambiguous. Accordingly, we cannot consider Beckman's testimony in interpreting the Agreement. Instead, we look to the text of the Agreement itself.

> The Shareholders Agreement provides that:
>
> Upon [AGAH's] disposition (whether by sale, lease, joint venture or otherwise) of all or part of the Assets, it will (I) first pay or otherwise satisfy all of its liabilities and, thereafter, (ii) distribute the net profits arising from such disposition, after payment of all income taxes and expenses related thereto ("Net Profits"), in respect of the Teleflex Shares and the Minority Shares in accordance with the terms and conditions of this Agreement. It is intended that Net Profits arising from any sale, lease or other use of the Assets be distributed in accordance with the terms of this Agreement.

(Agreement ¶ E.) Defendants argue that they did not breach the Agreement because dispersals to Shareholders could only be made once Net Profits accrued, and there were no additional Net Profits for distribution. (Resp. on Liability at 23.) According to Defendants, AGAH was obligated, as a member of the joint venture with TLM Aerospace, to satisfy ongoing financial obligations and it "was never in a position to be sure that all liabilities, expenses, or taxes related to the disposition of the Tiger assets had been paid so that Net Profits could be distributed." (*Id.*)

We tend to agree with Defendants that AGAH could have had continuing financial obligations as a member of a joint venture, which would have prevented it from accruing Net Profits to distribute to its shareholders. Although Plaintiffs seem to generally object to the use of AGAH's money to fund a joint venture, the Agreement clearly allows AGAH to enter into a joint venture as a way of disposing of the Assets. (Agreement ¶ E ("Upon [AGAH'S] disposition

(whether by sale, lease, *joint venture* or otherwise) of all or part of the Assets . . . .").)[4] The Defendants' response operates under the assumption that AGAH was itself a member of the joint venture. Even as explained in the facts set forth by Defendants, however, TFX Management was the active participant in the joint venture with TLM Aerospace, not AGAH. (Resp. on Liability at 5-6.) Additionally, and as we previously discussed, it is unclear at this time who owned TFX Management. *See supra* at 3-4. If TFX Management was a wholly-owned subsidiary of Teleflex rather than AGAH, then AGAH was not a participant in the joint venture. Accordingly, Defendants' proposition that AGAH had continuing obligations to the joint venture, thereby preventing it from accruing Net Profits, would fail.[5] Because there is an open question of fact as to who owns TFX Management, we cannot grant summary judgment in favor of Plaintiffs on its claim for breach of contract or for its requested compensatory damages.

## B. Notice Under Delaware Law

Section 271 of Delaware's General Corporation Law requires a majority shareholder vote

---

[4] We are not saying that, as a matter of law, if AGAH was itself a member of the joint venture forming TLM/Tiger Aircraft, its continuing obligations precluded any further accrual of Net Profits.

[5] Defendants additionally argue that Sickler and the other AGAH board members did not breach their fiduciary duties because Plaintiffs have not shown that they acted with bad faith. (Resp. on Liability at 24.) However, Plaintiffs have only moved for summary judgment on their breach of contract claim (Mem. on Liability at 11) and their claim under § 271 (*id.* at 9-10). They have not moved for summary judgment on their claim for breach of fiduciary duty. Defendants' arguments regarding the business judgment rule are inapplicable to either the breach of contract claim or the claim under § 271. *See, e.g.*, *In re: Classica Group*, No. 04-19875, 2006 WL 2818820, at *7 n.8 (Bankr. D.N.J. Sept. 29, 2006) ("Breach of contract is a common law claim and is not the subject of a business judgment rule analysis, which focuses strictly on matters of corporate governance."); (*Szeto v. Schiffer*, No. 12934, 1993 WL 513229, at *5 (Del. Ch. Nov. 24, 1993) ("Certainly if 8 Del. C. § 271 was violated, the directors' refusal to take action to rectify this violation could not be protected by the business judgment rule.").

of approval before a corporation may "sell, lease or exchange all or substantially all of its property and assets." Del. Code Ann. tit. 8, § 271. A corporation must hold a shareholder meeting for that vote and give shareholders 20 days' notice of that meeting. *Id.* This requirement only applies, however, when the assets at issue constitute "all or substantially all of its property and assets." *Id.*; *Gimbel v. Signal Cos.*, 316 A.2d 599, 605 (Del. Ch. 1974), *aff'd in part*, 316 A.2d 619 (Del. 1974) ("A sale of less than all or substantially all assets is not covered by the negative implication from the statute.").

Plaintiffs request summary judgment on this claim and argue that Defendants admit that they did not notify the Minority Shareholders of the planned divestiture of AGAH's remaining assets and did not pass a resolution approving that divestiture. However, Plaintiffs do not cite any case authority to support their claim for summary judgment.[6] Although they rely on the text of § 271, we cannot say as a matter of law that the divestiture of assets at issue here clearly falls within the scope of § 271. First, the text of § 271 refers to a "[sale], lease or exchange" of assets. Del. Code. Ann. tit. 8, § 271(a). The divestiture of assets at issue here is not clearly a sale, lease, or exchange of assets. Defendants, via TFX Management, used AGAH's remaining assets – cash – to fund a joint venture. It is possible that this could be considered a sale of assets by framing the investment in the joint venture as an obligation of AGAH's agreement to sell the Tiger Assets to Tong Lung Metal. However, neither party has clearly articulated how the divestiture of assets could be considered a sale, lease, or exchange.

Even assuming there was a sale, lease, or exchange of assets, there is a question of fact as

---

[6] In fact, Plaintiffs did not cite a single case in their entire memorandum in support of their motion on liability. We strongly urge the parties to support their arguments with authority in the future.

to whether Defendants were required to comply with § 271. As discussed above, § 271 only applies when "all or substantially all" of a corporation's assets are sold. In deciding whether a sale constitutes substantially all of a corporation's assets, we must consider the nature of the transaction. *Gimbel*, 316 A.2d at 606 ("The unusual nature of the transaction must strike at the heart of the corporate existence and purpose."). As the Delaware Court of Chancery explained, "[i]f the sale is of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation," § 271 applies. *Id.* In applying this analysis, Delaware courts conduct both a quantitative and qualitative analysis. *See id.* (considering the percentage of assets at issue and the character of the assets); *Katz v. Bregman*, 431 A.2d 1274, 1275-76 (Del. Ch. 1981) (analyzing the quantitative percentage of the assets and whether the sale of them was out of the ordinary).

Even if the assets at issue constitute a majority of the corporation's assets,[7] a corporation is not required to comply with § 271 if the sale is not out of its ordinary course of business or complied with its stated purpose. *See, e.g.*, *Oberly v. Kirby*, 592 A.2d 445, 464 (Del. 1991) ("Although the magnitude of the transactions was unquestionably large, the rule announced in *Gimbel* . . . makes it clear that the need for shareholder (or member) approval is to be measured not by the size of a sale alone, but also by its qualitative effect upon the corporation."). "[I]t is relevant to ask whether a transaction 'is out of the ordinary and substantially affects the

---

[7] We agree with Plaintiffs that, quantitatively, Defendants transferred the majority of AGAH's remaining assets. (Reply on Liability at 7.) We are not convinced by Defendants' contention that § 271 does not apply because the transfers were made gradually, rather than in one transaction. (Resp. on Liability at 12.) Defendants cite no cases to support that proposition and we doubt a Delaware court would find this argument persuasive. It would simply allow a corporation to obviate the requirements of § 271 by making many smaller sales, but ultimately achieving the same effect.

existence and purpose of the corporation . . . .'" *Id.* (citing *Gimbel*, 316 A.2d at 606)). Thus, even if the transactions are of a large magnitude, a corporation does not need member approval to complete the transaction if it is consistent with its purpose. *Id.*

Similarly, Defendants argue that "AGAH's transfer of assets to TFX Management and Tiger Aircraft was done to effectuate AGAH's business purpose, which was to dispose of the assets or otherwise put such assets to productive use." (Resp. on Liability at 20.) Accordingly, they contend that the transfer of assets to TFX Management did not require notice or shareholder approval under § 271. (*Id.*) We agree that it is possible that the transfer of AGAH's assets to TFX Management did not "substantially affect [its] corporate purpose." *Oberly*, 592 A.2d at 464. However, there are open questions of fact that must be determined before we can say that for certain. For example, as discussed above, it is unclear whether AGAH owned TFX Management. If it did, it is arguable that the transfer of money to TFX Management was not out of AGAH's business purpose. However, we will not decide that issue today. Because there is an open question of fact as to whether AGAH's transfer of assets to TFX Management substantially affected its corporate purpose, we deny Plaintiffs' motion for summary judgment on § 271.

## II. Defendants' Counterclaim

Defendants filed a counterclaim against Plaintiffs, seeking a declaratory judgment that would allow Teleflex to recoup the $2.3 million it advanced to TFX Management, which they claim was made on behalf of AGAH. (Am. Answer at 9.) They allege that if we find that Net Profits had accrued and should have been distributed to AGAH's shareholders, the Shareholders Agreement requires Plaintiffs and the other Minority Shareholders to repay Teleflex before those net profits can be distributed. (*Id.*) The Agreement states that

> The parties hereto expressly acknowledge and understand that [AGAH] will not make any distributions of Net Profits, dividends or otherwise in respect of the Shares prior to the payment in full of all of [AGAH's] obligations, including, without limitation, loans and other advances from the Shareholders that have heretofore been made to or on behalf of [AGAH] and that may hereafter be made to or on behalf of [AGAH] from time to time.

(Agreement Art. 4.2.) In the alternative, Defendants seek permission to off-set any damages that we may award by $2.3 million, the amount Teleflex advanced to TFX Management, allegedly on behalf of AGAH. (Am. Answer at 9.)

Plaintiffs move for summary judgment on Defendants' counterclaim, arguing that the Agreement "merely requires that all then-outstanding loans and advances be satisfied prior to any distributions under the Shareholders Agreement." (Mem. on Counterclaim at 6.) Plaintiffs further contend that Teleflex advanced the $2.3 million after any Net Profits became available for distribution. (*Id.* (citing Sickler Dep., Vol. II at 12-13.) Therefore, according to Plaintiffs, Teleflex is not entitled to repayment of those advances. (*Id.*) Defendants seem to misunderstand Plaintiffs' argument. We do not read Plaintiffs' position to indicate that they believe that Article 4.2 only applied to loans that existed at the time the Agreement was signed, as Defendants suggest. (Resp. on Counterclaim at 8-9.) Instead, we interpret Plaintiffs' argument to mean that any loans made by shareholders are only repaid if those loans were made before Net Profits accrued; if no additional Net Profits accrued after Teleflex loaned the money, the loan does not have to be repaid. (Mem. on Counterclaim at 6; Reply on Counterclaim at 2.) We agree with this interpretation of the Agreement.

Although we agree with Plaintiffs that Article 4.2 only requires repayment of loans made prior to the accrual of Net Profits for distribution, their motion for summary judgment on Defendants' counterclaim fails for the same reason their motion on liability fails: there is an

open question of fact as to the ownership of TFX Management and whether and when Net Profits actually accrued. Defendants argue that Teleflex made the $2.3 million in advances to satisfy AGAH's obligations as a member of the joint venture via TFX Management. (Resp. on Counterclaim at 8.) However, as discussed earlier, and as admitted by Defendants elsewhere (Resp. on Liability at 6), the ownership of TFX Management is still unclear. Accordingly, we cannot say that Teleflex advanced money to TFX Management on behalf of AGAH. Moreover, even if AGAH owned TFX Management, there remains an open question of when Net Profits accrued and what the amount of those profits were. Despite Plaintiffs' insistence, at this time, we cannot say that Net Profits had accrued because it is possible that AGAH had continuing financial obligations related to TFX Management's participation in the joint venture with TLM Aerospace. Therefore, we deny Plaintiffs' motion for summary judgment on Defendants' counterclaim.

## CONCLUSION

For the reasons state above, we deny Plaintiffs' motions for partial summary judgment and summary judgment.[8] It is so ordered.

_____
Honorable Marvin E. Aspen

Dated: September 22, 2009

---

[8] The parties are proceeding on a dual track: (1) preparing for trial; and (2) engaging in settlement discussions before Magistrate Judge Alexander. Accordingly, as previously ordered, the pretrial materials are to be filed on November 9, 2009; and trial is set for December 8, 2009. The parties' negotiations before the Magistrate Judge have been suspended temporarily pending the issuance of this opinion. We urge them now to resume these negotiations.